[Civ. No. 45035. Second Dist., Div. Two. June 30, 1975.]

SIGNAL OIL AND GAS COMPANY, Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

**Counsel**

Norman G. Kuch for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Philip C. Griffin and Lawrence K. Keethe, Deputy Attorneys General, for Defendant and Respondent.

**Opinion**

**BEACH, J.**—In two cases that were consolidated for trial, Signal Oil (Signal) sued the State Board of Equalization (Board) for recovery of motor vehicle fuel license tax paid after defendant Board collected deficiencies from Signal Oil. The deficiencies represent the difference between tax on temperature-corrected gallons of gasoline and volumetric gallons; Signal had used the former measure, and the Board claims it should have used a volumetric measure. Judgment was for the Board, and Signal appeals.

FACTS:

The case was heard on a stipulation of facts and the testimony of two witnesses for Signal. The volatile nature of gasoline, with its properties of expansion and contraction, is at the heart of this lawsuit. Signal tried to pay its tax based on "temperature-corrected" gallons of gasoline, a measure by which the gallonage delivered is decreased or increased from its actual ("volumetric") gallonage to the gallonage it would be at 60 degrees Fahrenheit. Temperature-corrected gallonage is acceptable for tax purposes, but only if certain requirements are met; whether Signal met those requirements is the issue herein.

Signal delivered gasoline to its dealers,[1] charging the temperature-corrected gallons at "posted delivery price" to each dealer's account receivable. Signal retained the sales invoices but did inform the service station dealer of the quantity of product delivered through a delivery ticket and/or bill of lading, which only reflected the gallonage and did not deal with revenues. Appellant also provided dealers with a collection report that established the adjusted price of gasoline.

In collecting for the gasoline sold, however, Signal collected an amount for gallons sold through the pump meter. If the gasoline had expanded, the dealers would be selling more gallons than the temperature-corrected gallonage on which Signal had been taxed. The money received from the dealers was posted as a credit to each dealer's account receivable. A monthly adjustment was made by taking the difference between the invoice price per gallon and the collection report price per gallon and multiplying it by the number of gallons metered through the dealer's pumps; this adjustment was charged or credited to the dealer's gasoline account receivable.

When a dealer went out of business, a physical inventory was taken of the volume of gasoline in the dealer's tanks, and a credit was given the dealer and taken by appellant against its reported taxable distributions in the month the event took place. If a new dealer went in, he was charged for the same gallonage as was credited to the outgoing dealer, and this was reported by appellant as a taxable distribution.

---

[1]The only dealers of Signal to whom this problem relates are the so-called "secured dealers." These dealers do not pay on delivery but upon later billing based upon the amount of gasoline sold by them. In contrast the "cash" dealers pay cash on delivery.

After a dealer terminated business, appellant wrote off the balance remaining in that dealer's account receivable; neither refund nor collection efforts were made to bring the balance of the terminating dealer's account to zero.[2]

The trial court found the above stipulated facts to be true, and further found, inter alia, that at no time did the secured dealer receive an original or any copy of an "invoice" from plaintiff Signal; there was no blank place to insert the price per gallon of gasoline on the delivery tickets; settlement between secured dealer and Signal was made on the basis of the volume of gasoline metered through the pumps recording sales to the public; and payment on settlement was not based on temperature-corrected gallonage. In addition, the court found that when the secured dealer went out of business, his account was cleared as to profit and loss, and neither the delivery tickets, the bills of lading, nor the invoices were used.

Based on those findings, the court made the following conclusions of law: Neither the invoice, temperature-corrected delivery receipt, nor bills of lading constituted an "invoice" under Revenue and Taxation Code section 7355 and Regulation 1121; appellant did not invoice temperature-corrected gallonage with respect to its secured dealers or consistently apply temperature correction with respect to its secured dealers; gasoline was properly measured by volumetric gallons, and the Board properly disallowed Signal's temperature correction.

CONTENTIONS ON APPEAL:

Appellant basically contends that the trial court made erroneous findings of fact and should have found as a matter of law that Signal had complied with the requirements of section 7355 that allow temperature-corrected measurement of gallonage.

Respondent argues that the findings are supported by the evidence and that section 7355 is not applicable since Signal did not invoice temperature-corrected gallonage to its secured dealers nor did it use temperature correction as a basis of settlement between itself and its secured dealers. In the event this court decides the findings and conclusions need supplementation or correction, respondent encourages

---

[2]The usual practice was to charge the amount due or credit the excess balance to the account of a new dealer whenever a new dealer took over a station.

us to make our own conclusions and findings. (*L.A.J., Inc.* v. *State Bd. of Equalization,* 38 Cal.App.3d 549 [113 Cal.Rptr. 319].)[3]

DISCUSSION:

The "gallon" used as the unit of measure for the motor vehicle fuel tax levied on the distributor of gasoline is defined to mean the volumetric gallonage "except that temperature corrected gallonage to 60 degrees Fahrenheit as invoiced to the purchaser will be accepted as the gallonage distributed with respect to the following distributions: . . . (e) To any person when the quantity distributed in any single delivery is 5,000 or more gallons and temperature correction is consistently applied to all such deliveries to the purchaser over a period of 12 or more consecutive months." (Rev. & Tax. Code, § 7355.) The issues contested herein are whether that gallonage distributed by Signal was temperature-corrected "as invoiced to the purchaser" and whether "temperature correction is consistently applied to all such deliveries to the purchaser over a period of 12 or more consecutive months." The trial court found in the negative on both of those issues.

1. ██ *The gallonage at issue was temperature-corrected "as invoiced to the purchaser."*

Neither the statute nor the regulations define invoice. Respondent argues that the document labeled "invoice" by Signal was never furnished to the purchaser and that the other documents that were provided to the purchaser do not constitute an invoice. We agree that the document labeled "invoice" does not qualify since it was not furnished to the dealers; however, the documentation as a whole fulfilled the invoice requirement of section 7355.

The loading ticket and delivery receipt showed both volumetric and temperature-corrected gallonage. While an invoice may frequently show the price of the goods delivered, such information is not a requirement.[4] The delivery receipt and loading ticket informed the purchaser of the items delivered and gave the temperature-corrected gallonage. That is

---

[3]Appellant makes the same request, though of course hoping for opposite findings.

[4]For example, Black's Law Dictionary (rev. 4th ed. 1968), defines invoice as "A list or account of goods or merchandise sent by merchants to their correspondents at home or abroad, in which the marks of each package, with other particulars, are set forth. . . . Written itemized accounts sent to a purchaser by the seller of merchandise. . . . A list . . . containing the items, together with the prices . . . ." Ballentine's Law Dictionary (3d ed. 1969), defines invoice, inter alia, as "A list of items included in a shipment . . . ."

sufficient to constitute "invoiced to the purchaser" under section 7355 of the Revenue and Taxation Code.[5]

2. *Temperature correction was "consistently applied to all such deliveries to the purchaser over a period of 12 or more consecutive months."*

Respondent claims that temperature correction was not applied to settlement between Signal and the dealer so that the "consistent application" provision of section 7355 was not met. The statute does not require temperature correction at settlement; it only requires that temperature correction be "consistently applied to all such *deliveries* to the purchaser over a period of 12 or more consecutive months." (Italics added.) The uncontradicted evidence was that such condition was met; the deliveries were all temperature corrected.

Only if "deliveries" were interpreted to include the entire commercial course of the subject gallonage would we be able to reach a different result. The Legislature could easily have required the distributor to use temperature correction at all stages and for all purposes in order to be taxed on that basis; however, the statute is directed to "deliveries" alone, and we decline to reach a strained interpretation of that word.

Signal therefore fits into the temperature-correction formula prescribed in section 7355 of the Revenue and Taxation Code. It meets the criteria of "invoiced to the purchaser" and "consistent application."

The judgment is reversed and the trial court is directed to enter judgment for Signal Oil and Gas Company.

Roth, P. J., and Compton, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied August 28, 1975.

---

[5]Respondent contends that under California Administrative Code, title 18, section 1121(c)(5), "invoice" must include "the furnishing of any statement of account which is used as a basis of settlement." However, that section of the regulations applies to distributors and their consignees; we are directed to no evidence that the dealers herein were consignees. Moreover, the regulation plainly stated that " 'Invoiced' *includes* the furnishing of any statement of account which is used as a basis of settlement between the distributor and the consignee." (Italics added.) The definition of invoiced is not limited to that situation.